[No. H009173. Sixth Dist. Sept. 9, 1992.]

KAUFMAN & BROAD-SOUTH BAY, INC., Plaintiff and Respondent, v. MORGAN HILL UNIFIED SCHOOL DISTRICT et al., Defendants and Appellants.

**COUNSEL**

Smith Woliver & Behrens, Jerome M. Behrens, David J. Wolfe, Lozano Smith and Louis T. Lozano for Defendants and Appellants.

Ware & Freidenrich, Jeffrey J. Lederman and Louis B. Green for Plaintiff and Respondent.

**OPINION**

**O'FARRELL, J.\***—This case arises out of a school district's attempt to create a Mello-Roos district to finance anticipated future needs due to population growth within its boundaries. Formation of the Mello-Roos district was successfully challenged by a developer on California Environmental Quality Act (CEQA) grounds. The primary issue on appeal is whether the formation of a community facilities district is a "project" within the meaning of CEQA.

---

\*Judge of the Monterey Superior Court sitting under assignment by the Chairperson of the Judicial Council.

BACKGROUND

*The California Environmental Quality Act*

The Legislature enacted CEQA in an effort to interpose some mandatory level of institutional concern for the environment into the public agency decisionmaking process. (CEQA; Pub. Resources Code, § 21000 et seq.[1]) Essentially, CEQA requires government agencies to prepare an environmental impact report (EIR) for any project they carry out or approve which may have a significant effect on the environment. (§ 21151.) "The purpose of an [EIR] is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061.)

■ "The act provides a three-tiered structure to guide agencies: If a proposed project falls within a category exempt from the requirements of CEQA by administrative regulation, or if it is certain that the project will not have a significant effect upon the environment, no further agency evaluation is required. [Citations.] If there is a possibility that the project may have a significant environmental effect, the agency must conduct an initial threshold study. [Citation.] If the initial study reveals that the project will not have such effect, the lead agency may complete a negative declaration briefly describing the reasons supporting this determination. [Citations, fn. omitted.] However, if the project may have a significant effect on the environment, an EIR must be prepared. [Citations.]" (*Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 999-1000 [165 Cal.Rptr. 514].)

*The Mello-Roos Community Facilities Act of 1982*

The Mello-Roos Community Facilities Act of 1982 (Gov. Code, § 53311 et seq.) authorizes local government agencies, including school districts, to form community facilities districts to "finance the purchase, construction, expansion, improvement, or rehabilitation of any real or other tangible property with an estimated useful life of five years or longer," as well as related planning and design work. (Gov. Code, § 53313.5.) The financed facilities need not be physically located within the Mello-Roos district. (Gov. Code, § 53313.5.) Funding under the act is through the use of special taxes, submitted to a two-thirds voter approval. (Gov. Code, §§ 53326, 53328.)

The Legislature has officially recognized the necessity of updating existing school buildings and acquiring new ones as a matter of general public

---

[1]All statutory references are to the Public Resources Code unless otherwise noted.

concern and obligation. To this end, it has encouraged the boards of local school districts to utilize alternative methods to fund school facilities, including the formation of community facilities districts. (Ed. Code, §§ 17701, 17718.5.)

Proceedings for the formation of community facilities districts are initiated by the adoption of a resolution of intention to establish the district. The resolution of intention sets a time for a public hearing on the establishment of the district, at which time interested persons may protest or otherwise comment on formation of the district. (Gov. Code, §§ 53321, 53323.) If a majority protest has not been made, the legislative body may adopt a resolution of formation establishing the district. (Gov. Code, § 53325.1.) Following establishment of the community facilities district, an election must be held within the district to authorize the proposed special tax. If fewer than 12 registered voters reside within the boundaries of the district on the date 90 days before the date of the hearing, then the tax is voted on by persons who own property within the district on the date of the hearing, each receiving 1 vote for each acre of land owned. If 12 or more registered voters reside within the district, then the election is by registered voters within the district. (Gov. Code, § 53326.)

### FACTUAL AND PROCEDURAL HISTORY

The Morgan Hill Unified School District (appellant or District) comprises approximately 300 square miles, including unincorporated areas in Santa Clara County, the City of Morgan Hill and parts of the City of San Jose. Some of the territory within the District is undergoing rapid residential development, which will lead to significant increases in student enrollment. The District has generated three documents—the Facilities Master Plan, the Justification Report for School Facility Fees, and the Report of the Facilities Planning Committee—which contain information on projected student enrollments and current facilities, analyze future needs and discuss funding needs and potential revenue raising options. These reports indicate a future need for new school facilities within the District; they do not contain any specific information regarding the location or construction of any such facilities.

On June 24, 1991, the District adopted a resolution establishing a community facilities district (CFD 1) under the Mello-Roos act encompassing an area where development was occurring as a means for raising funds for use in the future to acquire sites for the construction of schools, to lease or purchase portable classrooms and buses, and to rehabilitate future facilities.

By another resolution adopted at the same time, the District determined that formation of CFD 1 was not a project within the meaning of CEQA, and therefore not subject to its terms. This determination was made on the basis of the District's finding that the formation of CFD 1 had no "potential for resulting in physical change in the environment, directly or ultimately, and therefore is not a project as defined in Section 15378 of the State CEQA Guidelines."[2] This finding, in turn, was based upon the opinion of an engineering firm hired by the District to conduct a preliminary review of the action pursuant to CEQA to consider whether formation of the District had the potential for resulting in physical change to the environment. Included in the resolution was the statement that "This determination that the formation of the District is exempt from CEQA should not be deemed to exempt any projects undertaken by the District from the CEQA review process."

Kaufman & Broad-South Bay, Inc. (respondent) owns land located within the boundaries of CFD 1 upon which it is building or has built 498 single-family residences and condominiums. This is a high-density, moderately priced, housing project. The project will create (and in fact has already created) significant increases in student population within the school district. Kaufman & Broad opposed formation of CFD 1 because it believed it would impede its ability to maintain the moderate pricing of its homes (and thus its competitive edge) due to the imposition of special taxes on the property resulting from the Mello-Roos district. Accordingly, Kaufman & Broad lodged timely oral and written protests with the District opposing formation of CFD 1. It argued, among other things, that formation of the District was not exempt from environmental review under CEQA.

The boundaries of CFD 1 were drawn so that the area it included was not yet inhabited but instead was owned by various developers. Except for Kaufman & Broad, all the developers had agreed to join the Mello-Roos district in exchange for receipt of development approvals for their property. After the District passed the resolution declaring formation of CFD 1, an election was held seeking landowner approval of the district as required by the Mello-Roos act. The votes were not counted, however, because Kaufman & Broad filed a petition in superior court seeking a writ of mandate to compel compliance with CEQA. The votes remain secured pending outcome of this action.

Kaufman & Broad filed a petition for writ of mandate to set aside formation of CFD 1 on the ground that the District had not complied with

[2]References to "Guidelines" refer to the CEQA Guidelines set forth in the California Code of Regulations, title 14, section 15000 et seq.

CEQA. The trial court agreed with Kaufman & Broad, and found that establishment of the Mello-Roos district was a "project" within the meaning of CEQA, and thus subject to environmental review. The court issued a peremptory writ of mandate commanding the District to set aside the resolutions establishing CFD 1, and retained jurisdiction over the District's proceedings until it complied with the requirements of CEQA.

The trial court also rejected the District's request, made by way of motion for modification of judgment, that the establishment of CFD 1 be allowed to proceed subject to a condition that required environmental review occur before the expenditure of any funds. Finally, the court awarded Kaufman & Broad all of its attorney fees pursuant to Code of Civil Procedure section 1021.5 (private enforcement of a public right).

The District appeals from this judgment. It contends the formation of CFD 1 is not a project within the meaning of CEQA, and alternatively, if it is, that the court should grant equitable relief and allow formation of the district to proceed but restrict expenditure of the funds pending CEQA compliance. The District also challenges the award of attorney fees.

DISCUSSION

■ The District contends that formation of a community facilities district to raise revenue is not a project within the meaning of CEQA. ■ Whether an act constitutes a "project" within the purview of CEQA "is an issue of law which can be decided on undisputed data in the record on appeal," and thus presents no question of deference to agency discretion or review of substantiality of evidence. (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 794-795 [187 Cal.Rptr. 398, 654 P.2d 168].)

Section 21151 requires "all local agencies" to prepare an EIR "on any project they intend to carry out or approve which may have a significant effect on the environment." A "project" is defined in section 21065 as "(a) Activities directly undertaken by any public agency. . . . [¶] (c) Activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." The state CEQA Guidelines (Guidelines) further define project as ". . . the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately, and that is any of the following: [¶] (1) An activity directly undertaken by any public agency including but not limited to public works construction and related activities[,] clearing or grading of land, improvements to existing public structures, enactment and

amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof . . . ." (Guidelines, § 15378, subd. (a)(1).)

Certain projects are categorically exempt from CEQA. These include, but are not limited to, ministerial projects, emergency repairs to public service facilities, and certain activities necessary to maintain services within existing service areas. (See § 21080.) Additionally, the broad definition of project is tempered by the requirement that CEQA applies only to those activities which "may have a significant effect on the environment."

During preliminary review of a project, "(a) . . . a public agency shall determine whether a particular activity is exempt from CEQA. [¶] (b) Possible exemptions from CEQA include: [¶] (1) The activity is not a project as defined in [Guidelines] section 15378. [¶] (2) The project has been granted an exemption by statute . . . or by categorical exemption . . . . [¶] (3) The activity is covered by the general rule that CEQA applies only to projects which have the potential for causing a significant effect on the environment. Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA." (Guidelines, § 15061, subds. (a), (b)(1)(2)(3).)

■ In the case at hand, the District conducted a preliminary review of the environmental consequences of formation of CFD 1 and determined it did not have the potential for resulting in physical change in the environment, either directly or ultimately, and therefore was not a project as defined by Guidelines, section 15378. The District passed a resolution to that effect.

The District defends this position on appeal. It argues that the mere act of securing financing for anticipated but uncertain future projects necessary for it to continue providing appropriate educational services to its population does not create a significant effect on the environment. The District points out that some of the money raised from CFD 1 will be used for leasing or purchasing buses and portable classrooms. Additionally, while the District anticipates the need for new schools, it does not yet know where or when the schools will be needed. Residential development within the District is dependent upon other governmental agency decisions as well as developers' actions, and is not entirely predictable. The District reasons that while formation of CFD 1 may contribute to its ability to ultimately construct new schools, it in no way commits it to any particular course of action in that regard or influences the ultimate decisions which will affect the environment—whether, where and when to build new schools.

Exactly what constitutes a project within the meaning of CEQA is a question which has been addressed by California courts on several occasions since the enactment of CEQA in 1970. In the first of these cases, *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], the Supreme Court stated that CEQA is "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Id.* at p. 259.) Consistent with this guiding principle, the court held in *Friends of Mammoth* that the term "project" included not only government-initiated actions but also "the issuance of permits, leases and other entitlements" to private parties by governmental agencies. (*Id.* at p. 262.)

A few years later the high court further explored the definition of project. *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017] involved the annexation of the 677-acre Bell Ranch to the City of Camarillo. The annexation would remove the property from agricultural zoning controlled by the county agency and place it within the authority of the city which was prepared to approve its use for " 'residential, commercial and recreational' " purposes. (*Id.* at p. 281.) In holding that the proposed annexation constituted a project, the court emphasized that the annexation was an essential part of a development plan by which a property owner intended to urbanize agricultural property. "Planning was completed, preliminary conferences with city agencies had progressed 'sufficiently' and development in the near future was anticipated." (*Ibid.*, fn. omitted.) Thus it was apparent that the annexation would "culminate in physical change to the environment." (*Ibid.*) The court stressed that its holding was not intended to imply that "any . . . approval of any annexation to any city may have a significant effect on the environment." (*Id.* at p. 281.)

Later the same year a Court of Appeal distinguished *Bozung* on the basis that a proposed detachment of 10,000 acres of land from a recreation and park district would not lead to any physical change in the environment. (*Simi Valley Recreation & Park Dist.* v. *Local Agency Formation Com.* (1975) 51 Cal.App.3d 648 [124 Cal.Rptr. 635].) Although development was "starting to take place" or could be "expected to take place in the area proposed for detachment," the difference in *Simi Valley* was that the proposed development was not dependent upon the governmental action, as had been the case in *Bozung.* (*Id.* at p 665.) The detachment did not result in different zoning and therefore "did not make any change whatever in the uses to which the land might be put." (*Id.* at p. 666.) The court concluded that the evaluation process contemplated by CEQA should not be applied "to every change of organization or personnel which may affect future determinations relating to the environment." (*Ibid.*)

The Supreme Court took up the issue again in the case of *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d 779. That case involved the potential environmental impacts of a reconfiguration of school districts. The community of Yorba Linda had its own elementary school district, but was part of the Fullerton Joint Union High School District. The local committee on school district organization prepared a plan to create a Yorba Linda Unified High School District, which provided that the Yorba Linda portion of the Fullerton School District would secede and become unified with Yorba Linda Elementary. The State Board of Education approved the plan and ruled that it did not have to undertake CEQA review in so doing. The Fullerton Joint Union High School District challenged this action.

Ultimately, the Supreme Court agreed with the Fullerton School District. It found that "[i]mplementation of the secession Plan in the present case involves the possibility of a significant impact. Secession will likely require the construction of a new high school in Yorba Linda and may result in abandonment of some facilities in the remaining portion of the Fullerton HSD. It will change bus routes and schedules, and affect traffic patterns. Although it is uncertain whether the total impact will be significant enough to require an environmental impact report, it is clear that it is sufficient to require at least an initial study to inquire into the need for such a report." (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d at p. 794, fn. omitted.)

Citing its previous holdings, the court stressed that for an activity to be a "project" requiring environmental review, it need not have a direct effect on the environment. But it must, like the use permit in *Friends of Mammoth* and the annexation in *Bozung,* be "a necessary step in a chain of events which would culminate in physical impact on the environment." (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d at p. 795.)

The *Fullerton* court then reiterated: "The anticipated environmental impact here stems from the construction of a new high school in Yorba Linda and consequent changes in the remaining portion of the Fullerton HSD. Although it is conceivable that Fullerton HSD itself could build a high school in Yorba Linda, it is apparent that it does not intend to do so; the future Yorba Linda Unified School District, on the other hand, must construct such a facility. Thus, as a practical matter State Board approval of the secession Plan is an essential step leading to ultimate environmental impact; it is therefore under the reasoning of *Bozung* and *Simi Valley* a 'project'

within the scope of CEQA. (See *People ex rel. Younger* v. *Local Agency Formation Com.*, [1978], 81 Cal.App.3d 464, 478 [146 Cal.Rptr. 400].)" (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra*, 32 Cal.3d at p. 797.)

Kaufman & Broad argues, under the expansive definition of "project" contemplated by CEQA as explained in *Fullerton*, that formation of CFD 1 is an "implementation step in a comprehensive process established and being carried out which can, and ultimately will, result in physical changes to the environment. Therefore, it is a project which requires environmental review." We disagree for the following reasons.

In *Fullerton*, as in *Bozung*, the governmental action was an *essential* step in a chain of events leading to change in the the physical environment. In *Bozung* development of agricultural land was dependent upon annexation by the city. In *Fullerton* the court found the secession plan created the need for a new high school in Yorba Linda in the near future, and that buildings in the original joint district might be abandoned and traffic flow altered. Thus, the court concluded that the state board's action authorizing creation of the new district ultimately caused the likelihood of significant environmental impact.

In our case, the causal link between the action (formation of CFD 1) and the alleged environmental impact (construction of new schools) is missing. Unlike the formation of the new school district in *Fullerton*, the formation of the facilities district here will not create a need for new schools. Nor is the construction of new school facilities entirely dependent upon the formation of CFD 1. Development is already taking place in the area and facilities will (or will not) have to be constructed to accommodate the student population regardless of whether CFD 1 is formed. If CFD 1 fails, the District will have to find some other method to meet its obligation to provide services.

The only foreseeable impact from formation of CFD 1 is that when the District does determine sometime in the future to acquire sites for the construction of schools, to lease or purchase portable classrooms and buses, and to rehabilitate future facilities it will have some of the funds necessary to do so. When it makes those decisions, which depend in large part on the pattern of development within the District, it will have to examine the environmental impacts. Here the District's resolution forming CFD 1 is not "an essential step culminating in action which may affect the environment." (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra*, 32 Cal.3d at p. 797.)

The District has also raised the argument that CEQA review would be premature at this time because no definite plan has been formulated as to

where or when to construct new facilities, and whether classroom reconfiguration or portable classrooms at existing sites might be appropriate. In short, it maintains there is no plan to review. Respondent contends that review is necessary now because once the District obtains the financing, it will be more likely to build new schools to serve its student population, rather than utilize other options.

■ "A basic tenet of CEQA is that an environmental analysis 'should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment.' [Citations.]" (*Laurel Heights Improvement Assn.* v. *Regents of University of California*, (1988) 47 Cal.3d 376, 395 [253 Cal.Rptr. 426, 764 P.2d 278].) Cases have balanced the protection provided by conducting environmental review at the "earliest feasible stage" against the equally compelling practical demand that the decisionmaking process underlying a given "project" be sufficiently developed to provide meaningful information for technical review. (*Stand Tall on Principles* v. *Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772, 780-781 [1 Cal.Rptr.2d 107].) "[A]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 199 [139 Cal.Rptr. 396].)

*Stand Tall on Principles* v. *Shasta Union High Sch. Dist., supra*, 235 Cal.App.3d 772, on which the District places great reliance, concerned a resolution by a school district to accept a site for a new school. The question presented was whether the school district had to prepare an EIR during the selection process or whether it could wait until a preferred site had been selected. The court found it could wait, provided that the EIR was prepared prior to acquisition of the site and that it considered all reasonable alternative sites. The court in *Stand Tall* reasoned that the district's selection of a preferred site did not constitute the "approval" of a project for which an EIR must be done. (§ 21151; *Friends of "B" Street* v. *City of Hayward, supra*, 106 Cal.App.3d at p. 999.) The board's resolutions "do not constitute an 'approval' under CEQA because they do not commit the District to a *definite course* of action since they are expressly made contingent on CEQA compliance." (235 Cal.App.3d at p. 781, italics in original.)

Although this case does not turn on whether the District's act constituted a "project approval," we find the *Stand Tall* court's discussion of the timing issue significant. There, the court held that the school district did not need to conduct environmental review of its project to build a new school until it had

selected a tentative site for the school. The court emphasized the need to balance the protection provided by early environmental review against the practical requirement of specific information to permit meaningful environmental assessment. (*Stand Tall on Principles* v. *Shasta Union High School Dist.*, *supra*, at pp. 780-781.)

 Here, as noted earlier, formation of CFD 1 does not commit the District to any definite course of action. It does not dictate how funds will be spent, or in any way narrow the field of options and alternatives available to the District. In cases such as this where funding issues alone are involved, courts should look for a binding commitment to spend in a particular manner before requiring environmental review. While we can envision a situation where a community facilities district might be formed to fund a specific project and therefore trigger the need for CEQA review, that is not the case here. Moreover, environmental review of the District's reports of its future needs would be meaningless. There is simply not enough specific information about the various courses of action available to the District to warrant review at this time. Respondent's assertion that the District will be more likely to build new schools than look to other solutions to increased enrollment is nothing more than speculation about a future policy decision.

We also reject respondent's contention that the lack of a specific or identifiable plan is unimportant because CEQA provides for phased environmental review. CEQA permits variations in EIR's to accommodate different situations and intended uses. (Guidelines, § 15160.) EIR's may be "staged" to deal with multiple or phased projects (Guidlines, §§ 15165, 15167), or may be "tiered" with separate but related projects to eliminate repetitive discussions of the same issues and focus the EIR on the actual issues ripe for decision at each level of environmental review (Guidelines, § 15152.) Phased review imposes an element of flexibility into the CEQA process, allowing the specificity of the EIR to adjust to the project. It does not obviate the need for the initial project to be sufficiently advanced to begin environmental review.

In sum, we hold that the formation of a Mello-Roos district under the facts of this case was not a project within the scope of CEQA. In light of this holding, the award of attorney fees to respondent was also improper.

### CONCLUSION

The judgment of the superior court and the award of attorney fees are reversed. The District shall recover its costs on appeal.

Cottle, Acting P. J., and Bamattre-Manoukian, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 25, 1992.