[No. F050117. Fifth Dist. Jan. 12, 2007.]

FRIENDS OF THE SIERRA RAILROAD, Plaintiff and Appellant, v.
TUOLUMNE PARK AND RECREATION DISTRICT, Defendant and
Respondent;
TUOLUMNE BAND OF ME-WUK INDIANS, Real Party in Interest and
Respondent.

**COUNSEL**

Remy, Thomas, Moose and Manley, Whitman F. Manley, Sabrina V. Teller and Michele A. Tong for Plaintiff and Appellant.

Holland & Knight, Jerome L. Levine, Frank R. Lawrence, J. Michelle Hickey, Amanda J. Monchamp and Timothy Q. Evans for Defendant and Respondent and for Real Party in Interest and Respondent.

**OPINION**

**WISEMAN, J.**—Tuolumne Park and Recreation District, a public agency, sold land containing a disused but historic railroad right-of-way to the Tuolumne Band of Me-Wuk Indians without carrying out any environmental review pursuant to the California Environmental Quality Act (CEQA). The Tuolumne Band owned surrounding property and was known to plan on developing it, but had never presented any development plans to any agency. The trial court denied a petition for a writ of mandamus directing the transferor agency to reverse its action. In this appeal, appellant Friends of the Sierra Railroad argues that the transfer fell within CEQA's definition of a "project" requiring environmental review because it was reasonably foreseeable that the land would be developed and the development would have an impact on the historical resource. We hold that the transfer was not a project requiring CEQA review because, although some development of the property surrounding the historical resource was reasonably foreseeable, review of conceivable impacts on the historical resource itself would have been premature in the absence of any concrete development proposals. The judgment is affirmed.

## *FACTUAL AND PROCEDURAL HISTORIES*

The history of the Sierra Railway Company (later called the Sierra Railroad Company) is described in the administrative record in a nomination form for the National Registry of Historic Places. The California State Historic Resources Commission has found the entire railroad eligible for inclusion in the national registry.

The railroad was organized by the gilded-age magnates William H. Crocker, Thomas S. Bullock, and Andre Poniatowski in 1897. The 56.2-mile main line was constructed between 1897 and 1900, running from the San Joaquin Valley town of Oakdale in Stanislaus County eastward to Tuolumne City in the Sierra Nevada foothills of Tuolumne County, and rising from 155 feet to 2,690 feet in elevation. The final 6.2 miles of the historic right-of-way, from Standard to Tuolumne City, are at issue in this litigation.

The railroad played a major role in the development of the region. According to the national registry application, "This small r[ai]lroad line touched every aspect of the economic and social life in this section of the Mother Lode country, hauling freight for the major quartz mines in the area, serving the major logging and timber interests in the area, assisting in the construction of most major hydroelectric power projects in the vicinity, in addition to its role as a passenger line."

The main line remains largely intact. The national registry application says that "[t]rack alignment along this line remains substantially unaltered from its construction date in 1897–1900," and that "[t]he system as a whole retains a very high degree of integrity to its appearance when it was constructed at the turn of the century." Staff of the State Historical Resources Commission opined that it is "the most intact historic railroad system in California. Other historic properties in the state retain integrity of track alignment, rollingstock or railroad yard structures. The Sierra is unique in that all of these major components have been preserved."

Facilities in Jamestown were the original operating center of the railroad and comprise most of its historic structures today. These include a round-house, turntable, water and oil facilities, car repair and maintenance shops, freight buildings, and other structures. Antique locomotives and rail cars are also housed there. The Jamestown facilities are presently a state park, Railtown 1897 State Historic Park.

The remainder of the historic railroad consists primarily of only the tracks and route themselves. In addition, there is a historic depot in Standard and four trestles built in 1900 along the line. There are switching yards and side tracks at the ends of the line in Oakdale and Tuolumne City. The land along the line is largely uninhabited and lacks power lines, so the historical integrity of its setting is high. The railroad has been a popular location for filming movie and television productions for this reason.

In addition to the state park in Jamestown and the television and movie shoots, activities supported by the railroad today are a freight service transporting lumber between Keystone and Oakdale and a passenger excursion service out of Oakdale, both carried on by a private company. Trains no longer travel on the Standard-to-Tuolumne portion at issue in this case.

The railroad has a role in the 2002 Tuolumne County recreation master plan. This plan describes a proposed Sierra railroad trail, extending along the railroad right-of-way from the Stanislaus County line to the railroad's end in Tuolumne City. The trail would link with a proposed extension of the existing Westside Railroad Trail, which follows the right-of-way of a narrow-gauge logging railroad that connected the Tuolumne City terminus of the Sierra Railroad to timberlands in the mountains. This proposed extension of the Westside Railroad Trail is part of the master recreation plan of respondent Tuolumne Park and Recreation District (TPRD). In correspondence with the TPRD, appellant Friends of the Sierra Railroad (FSR) asserted that the railroad also played a role in the 1996 Tuolumne County general plan and the 1996 Tuolumne County regional transportation plan, but these claims have not been repeated in FSR's appellate briefs.

TPRD acquired the 6.2-mile Standard-to-Tuolumne segment of the line from the railroad's owners for about $85,000 in 1986. According to newspaper reports, this was the beginning of a political struggle over plans by TPRD to operate excursion trains between Tuolumne and Standard. TPRD announced a deal to purchase two locomotives, leading to a recall drive by opponents of the trains. The recall drive was called off after directors canceled the locomotive purchase plan. In 1991, a three-person anti-train majority was elected to the TPRD's board of directors. In 1992 and 1997, TPRD considered proposals to swap the Standard-to-Tuolumne line segment for other real property and cash, incurring the opposition of FSR. These proposals did not come to fruition.

The deal that is the subject of the present litigation was first proposed in 2002. Real party in interest Tuolumne Band of Me-Wuk Indians (the Tribe) purchased the West Side Lumber Company property on the western edge of Tuolumne City that year. The West Side Lumber Company was the location of the historical terminus of the railroad. (The lumber mill located there was destroyed by fire in 1962 or 1963.) A 0.6-mile portion of the right-of-way, 100 feet wide, runs across the Tribe's 300-acre property. The Tribe proposed a deal in which it would acquire the Standard-to-Tuolumne line in exchange for a building and land it owned in Tuolumne City, plus $75,000 cash. According to newspaper reports, the Tribe's chairman stated that the acquisition would facilitate its development of the West Side Lumber Company property. The Tribe, which owns the Black Oak Casino near Tuolumne City, was interested in building a hotel, a commercial development, and homes on the property. Administrative offices for the casino have already been opened on the site and a medical clinic was under construction. "If someone else has control of [the right-of-way], that could jeopardize our project," the Tribe's chairman reportedly said.

After receiving the Tribe's proposal, TPRD applied to the Tuolumne County Planning Commission for a determination that transferring the property would be consistent with the county's general plan. The Tribe submitted a letter in support of the application, stating that it "proposes" to use the right-of-way "for public hiking trails." The commission issued the requested determination, but specified that it was "based upon the use of the property solely as a trail dedicated for public use by pedestrians, equestrians, and non-motorized vehicles and/or for a railroad." The commission also stated that "the determination of consistency applies regardless of whether the property is conveyed to any public or private entity or to the Tuolumne Band of Me-Wuk Indians."

In correspondence with TPRD, FSR argued that, because the right-of-way is a historical resource, TPRD was required to carry out environmental

review under CEQA (Pub. Resources Code, § 21000 et seq.)[1] before disposing of the property. The record contains no indication that TPRD ever made a formal decision that the transaction did not require CEQA review. In fact, there is no evidence that TPRD's directors ever formally considered undertaking CEQA review, although the issue was raised by FSR and other members of the public at public-comment sessions. The only document in the record to which TPRD points in this regard is a handwritten note saying, in its entirety, "is exchange agreement subject to CEQA—if so it may have started w/resolution." There is no indication who wrote this note, or when, or to whom it was directed. The lack of evidence on this point may be attributable to TPRD's decision to hold meetings in which its board discussed the transfer with the Tribe in closed session, a decision that led to a subsidiary dispute between TPRD and FSR about compliance with California's open-meetings law, the Ralph M. Brown Act. (Gov. Code, § 54950 et seq.) In any event, it is undisputed that no CEQA review was undertaken.

In addition to the question of CEQA compliance, another issue that generated public comments was whether TPRD ever really owned those portions of the Standard-to-Tuolumne segment that are outside the West Side Lumber Company property. The Tuolumne County Superior Court ruled in 1989 that TPRD owned the 0.6-mile portion inside the West Side Lumber Company property in fee simple, but adjacent owners claimed that the remainder was only an easement and had long since been extinguished on account of the railroad's abandonment. The Tribe's chairman was quoted in a newspaper report as saying, "We aren't so concerned right now about outside of our property [i.e., the West Side Lumber Company property], but we will look at the options if the deal goes through."

On March 28, 2005, TPRD adopted a resolution authorizing the transfer of the property to the Tribe. TPRD and the Tribe executed a transfer agreement the same day. According to a newspaper report, the president of TPRD's board said, "We are finally out of the railroad business for good."

On May 4, 2005, FSR filed a petition for a writ of mandate in superior court pursuant to Code of Civil Procedure section 1085 and Public Resources Code section 21168.5. It asked the court to set aside the transfer and order TPRD to carry out environmental review pursuant to CEQA before disposing of the property.

The court denied the petition. After noting that it was "not disputed that the right-of-way falls within the definition of a historic resource for CEQA

---

[1] Subsequent statutory references are to the Public Resources Code unless indicated otherwise.

analysis," it stated that "the only question" before it was "whether there is evidence in the record which would support a reasonable argument that the transfer of title to the right-of-way may cause a reasonably foreseeable indirect physical change to the environment." It concluded that the evidence did not support this because the view that the Tribe might carry out development plans impacting the historical resource was "based on sheer speculation . . . and any attempt to analyze undisclosed plans would necessarily be purely hypothetical and premature." The court also rejected FSR's contention that the change in ownership would insulate the property from future environmental review, saying that any future proposals to develop the property or change its use would be subject to CEQA. It dismissed as speculative FSR's argument that the Tribe could insulate its plans from future review by placing the land in trust with the Bureau of Indian Affairs, removing it from the jurisdiction of local regulators. For those reasons, the court ruled that the transfer was not a "project" within the meaning of CEQA.

## *DISCUSSION*

The prediction that future development will impact the 0.6-mile portion of the right-of-way crossing the West Side Lumber Company property is not sheer speculation. There is every reason to believe the Tribe acquired the right-of-way to further its plans for developing the West Side Lumber Company property. We do not understand the Tribe to be genuinely denying this fact. The brief submitted jointly by it and TPRD asserts that "the land's use before and after the transfer would remain exactly the same," but it does not say for how long. It also does not say it was a coincidence that the right-of-way happened to cross property the Tribe owned and wanted to develop.

In spite of this, we agree with the trial court's ultimate conclusion that CEQA review would have been premature because no particular development plans had been announced. Therefore, we hold that the transfer was not a project within the meaning of CEQA. As we will explain, *some* plan with an identifiable impact on the right-of-way would have to be on the table before the CEQA review process could be meaningfully carried out. There is no reason why CEQA review cannot be triggered by a transfer of ownership away from a public agency if development plans are presented at the same time, but that is not what happened here.

I. *Standard of review*

In its petition for a writ of mandamus, FSR properly cited Code of Civil Procedure section 1085 (traditional mandamus) rather than Code of Civil Procedure section 1094.5 (administrative mandamus) because the agency

action being reviewed was quasi-legislative, not quasi-adjudicatory. (See *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 517 [113 Cal.Rptr. 836, 522 P.2d 12]; *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1057, fn. 9 [48 Cal.Rptr.3d 563]; *Neighborhood Action Group v. County of Calaveras* (1984) 156 Cal.App.3d 1176, 1186 [203 Cal.Rptr. 401].) There is no doubt that a public agency's decision to sell a piece of property it wishes to dispose of is nonadjudicatory in character, so Code of Civil Procedure section 1085 applied. ▮ When considering a petition for traditional mandamus seeking relief under CEQA from an agency's action, the trial court reviews the agency's action for abuse of discretion. (§ 21168.5; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5 [253 Cal.Rptr. 426, 764 P.2d 278].) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) "Substantial evidence" is defined in the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Cal. Code Regs., tit. 14, § 15384, subd. (a).)

In dealing with an agency's conclusion that the action in question was not a project within the meaning of CEQA, however, the trial court can employ its own analysis of undisputed facts in the record and decide the question as a matter of law without deference to the agency's decision. (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 794–795 [187 Cal.Rptr. 398, 654 P.2d 168] (*Fullerton*), disapproved on other grounds by *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 918 [13 Cal.Rptr.2d 245, 838 P.2d 1198]; *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 470 [11 Cal.Rptr.2d 792] (*Kaufman & Broad*).) The Court of Appeal reviews the trial court's decision de novo, applying the same standards to the agency's action as the trial court applies. (*Neighbors of Cavitt Ranch v. County of Placer* (2003) 106 Cal.App.4th 1092, 1100 [131 Cal.Rptr.2d 379].) The bottom line for us here, as the parties agree, is that we are to review the undisputed facts in the record and determine independently whether the transfer was a CEQA project as a matter of law.

Since this is the standard of review, we disregard two procedural arguments made in FSR's briefs. First, FSR asserts that the trial court "engaged in a determination of fact, rather than law" when it reviewed the record and determined that the transfer was not a project. Due to the fact that we are reviewing the administrative record independently and not deferring to the trial court's ruling, we need not consider purported defects in the trial court's manner of proceeding. Next, FSR contends that TPRD abused its discretion

by failing to make a formal inquiry and decision on the subject of whether the transfer was a CEQA project or not. We are making an independent decision on that subject as a matter of law based on undisputed facts in the administrative record, so procedural failings on the part of the agency, if any, can have no effect one way or the other on the result we reach.

## II. *The meaning of "project"*

■ If an action is a "project" within the meaning of CEQA and not exempt, a public agency intending to approve it must first engage in environmental review, meaning that an environmental impact report or a negative declaration (explaining why no environmental impact report is necessary) must be prepared and must be considered by the agency. (Cal. Code Regs., tit. 14, § 15004, subd. (a).) TPRD did not do this, so its action was proper only if the transfer was not a project or was exempt. TPRD does not claim an exemption, so the only question is whether the transfer was a project.

CEQA defines a project as follows:

" 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following:

"(a) An activity directly undertaken by any public agency.

"(b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.

"(c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065.)

Further, "[a] project that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment." (§ 21084.1.)

■ CEQA's conception of a project is broad. Our Supreme Court has stated that when a court determines whether an activity is a project, the statute is "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049], disapproved on other grounds by

*Kowis v. Howard* (1992) 3 Cal.4th 888, 896–897 [12 Cal.Rptr.2d 728, 838 P.2d 250].) Activities that have been held to constitute projects include not only approvals of real estate developments, but many other decisions with a potential to affect the environment significantly. These include the addition of plastic pipe as an acceptable material under building regulations (*Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1413 [22 Cal.Rptr.3d 393]); approval of a regional transportation plan (*Edna Valley Assn. v. San Luis Obispo County Etc. Coordinating Council* (1977) 67 Cal.App.3d 444, 447–449 [136 Cal.Rptr. 665]); and an increase in a bus fare (*Shawn v. Golden Gate Bridge etc. Dist.* (1976) 60 Cal.App.3d 699, 701–702 [131 Cal.Rptr. 867]). (See also *Fullerton, supra,* 32 Cal.3d at p. 796, fn. 16 [CEQA project includes many activities not related to land development that involve some other environmental impact].)

■ In keeping with this broad conception of a project, the CEQA Guidelines call for CEQA review at an early stage in any process that will lead to an impact on the environment. Environmental documents (environmental impact reports or negative declarations) "should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design." (Cal. Code Regs., tit. 14, § 15004, subd. (b).) Without first carrying out CEQA review, agencies must not "take any action which gives impetus to a planned or foreseeable project in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review." (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(B).)

This means that agency action approving or opening the way for a future development can be part of a project and can trigger CEQA even if the action takes place prior to planning or approval of all the specific features of the planned development. In *Fullerton, supra,* 32 Cal.3d 779, the Supreme Court held that the State Board of Education's approval of a plan to allow Yorba Linda to secede from the Fullerton High School District was a CEQA project and that CEQA review was not premature. None of the necessary decisions had been made about construction in the new district. Yorba Linda did not contain a high school and one would have to be built; and other actions, such as the alteration of bus routes, would necessarily have to be taken. (32 Cal.3d at pp. 784, 794–797.) Therefore, the board's approval was "an essential step leading to ultimate environmental impact" and constituted a project. (*Id.* at p. 797.) CEQA review could not be delayed until a later stage even though "a more specific and useful [environmental] study" might be possible later. (32 Cal.3d at p. 797.)

■ At the same time, CEQA review is premature if the agency action in question occurs too early in the planning process to allow meaningful

analysis of potential impacts. Although environmental review must take place as early as is feasible, it also must be "late enough to provide meaningful information for environmental assessment." (Cal. Code Regs., tit. 14, § 15004, subd. (b).) In *Kaufman & Broad, supra,* 9 Cal.App.4th 464, the question was whether a project existed when a school district passed a resolution to create a Mello-Roos community facilities district to raise tax revenue to acquire future school sites, among other things. (*Id.* at pp. 466, 468.) A housing developer, wishing to defeat the tax, challenged this action under CEQA, claiming that the creation of the community facilities district was a project requiring environmental review. (*Kaufman & Broad, supra,* at p. 469.) The Court of Appeal disagreed, concluding that "the causal link between the action (formation of [the community facilities district]) and the alleged environmental impact (construction of new schools) is missing." (*Id.* at p. 474.) The court distinguished *Fullerton, supra,* 32 Cal.3d 779: "Unlike the formation of the new school district in *Fullerton,* the formation of the facilities district here will not create a need for new schools. . . . Development is already taking place in the area and facilities will (or will not) have to be constructed to accommodate the student population regardless of whether the [community facilities district] is formed." (*Kaufman & Broad, supra,* 9 Cal.App.4th at p. 474.) Creation of the community facilities district did not "commit the [school district] to any definite course of action" or "in any way narrow the field of options and alternatives available" to the school district. (*Id.* at p. 476.) More importantly, environmental review at that stage would be "meaningless" because "[t]here is simply not enough specific information about the various courses of action available to the [school district] to warrant [environmental] review at this time." For those reasons, the court held that there was no project. (*Ibid.*)

The Court of Appeal considered a similar situation in *Not About Water Com. v. Board of Supervisors* (2002) 95 Cal.App.4th 982 [116 Cal.Rptr.2d 526]. After a vote by landowners, the board of supervisors established the Rural North Vacaville Water District. Some time later, the board established an assessment district for the purpose of raising revenue, through property assessments, to fund construction of a water delivery system. (*Id.* at p. 988.) The time limit for challenging the creation of the water district had passed, so the petitioners claimed that the creation of the assessment district without environmental review violated CEQA. (*Not About Water Com.,* at pp. 1001 & 1002, fn. 6.) Relying on *Kaufman & Broad, supra,* 9 Cal.App.4th 464, the appellate court held that the assessment district's creation was not a project because it had no impact on the environment. Unlike the water district, the assessment district was only a map, drawn " '. . . to serve as the conceptual medium for the recognition of economic benefits conferred and the imposition of a corresponding fiscal burden.' " (*Not About Water Com. v. Board of Supervisors, supra,* 95 Cal.App.4th at p. 1002.) Illustrating the closeness of

this type of question, the court stated in dictum that the prior creation of the water district might have been a CEQA project. (*Not About Water Com.*, at p. 1002.)

The court also relied on *Kaufman & Broad, supra*, 9 Cal.App.4th 464 in *Citizens to Enforce CEQA v. City of Rohnert Park* (2005) 131 Cal.App.4th 1594 [33 Cal.Rptr.3d 208]. There, a city entered into a memorandum of understanding (MOU) with an Indian tribe regarding a gambling casino the tribe proposed to construct outside the city limits. (*Citizens to Enforce CEQA v. City of Rohnert Park, supra*, 131 Cal.App.4th at pp. 1597–1598.) The MOU was "an agreement to establish a source of funds for potential future improvements if the casino project takes place." (*Id.* at p. 1601.) It also addressed "the ways in which the Tribe agrees to mitigate potential impacts of its casino project." (*Id.* at p. 1600.) Noting that the MOU acknowledged that CEQA review could be required if the city should ever actually provide infrastructure for the casino, the court held that the city's entry into the MOU itself was not a project because it was merely the authorization of a funding mechanism. (*Citizens to Enforce CEQA*, at p. 1601; see also Cal. Code Regs., tit. 14, § 15378, subd. (b)(4) [mere creation of governmental funding mechanism without a commitment to undertake any specific activity is not a project].)

III. *The transfer was not a project*

FSR argues that TPRD's transfer of the Standard-to-Tuolumne right-of-way was a project because it was an activity directly undertaken by a public agency that may cause a reasonably foreseeable indirect physical change in a historical resource. The reasonably foreseeable change is the impact the Tribe's development could have on the right-of-way, whatever that impact might turn out to be. FSR says the transfer "represents a first step toward a physical change in the environment."

We begin our analysis by considering the strengths of FSR's position. It is true that development of the West Side Lumber Company property by the Tribe is reasonably foreseeable. It is also reasonable to infer that the Tribe acquired the right-of-way crossing in order to facilitate this development. Further, it is possible that the development eventually undertaken could have a variety of CEQA-cognizable impacts on the historical resource. The development could destroy the resource by simply building something on top of it, for instance. Or it could disrupt the county's general plan by closing the resource to the public or by altering it in ways that would make it unsuitable for use as a public hiking or equestrian trail or as a railroad. (See Cal. Code Regs., tit. 14, § 15125, subd. (d) [environmental impact report must disclose inconsistencies between project and general and regional plans].)

### A. *Meaningful CEQA review was not yet possible*

In spite of these possibilities, we conclude that this case more closely resembles those prior cases in which no CEQA project was found or where CEQA review was premature than those in which there was a project or review was not premature.[2] The reasonably foreseeable likelihood of *some* development on the West Side Lumber Company property, combined with the possibility that the development could impact the historical resource included within the larger property, does not trigger CEQA review. CEQA review has to happen far enough down the road toward an environmental impact to allow meaningful consideration in the review process of alternatives that could mitigate the impact. If TPRD knew, for instance, that the Tribe intended to damage the historic resource by building a structure in the right-of-way, or knew of a plan to devote the right-of-way to a use inconsistent with the county's general plan, it could have rejected the deal or conditioned the transfer on the Tribe's covenant not to do those things. As it was, no specific plans were on the table. The Tribe has not proposed any development that would affect the historical resource. The only statement it has made on the subject is its letter requesting a determination of consistency with the county general plan, in which it said it "proposes" to use the right-of-way for public hiking trails.

FSR describes the Tribe's reticence on the subject as a "lack of candor," but we cannot assume that is the case. The truth could be that the Tribe still has no specific plans affecting future uses of the right-of-way. Even if it does, but has made a strategic decision not to present them until after the termination of this litigation, the fact remains that ordering CEQA review in the absence of a plan involving an identifiable impact would not be meaningful.

*Topanga Beach Renters Assn. v. Department of General Services* (1976) 58 Cal.App.3d 188 [129 Cal.Rptr. 739] is instructive about the effect of unknown development plans on the issue of whether there is a project when an agency's action opens the way for a conceivable but unspecified environmental impact. The state purchased 79 beach houses on Topanga Beach. It planned to evict renters living in the houses, demolish the houses, and open the beach to the public. The superior court enjoined the demolition and directed the state to complete an environmental impact report. (*Id.* at

---

[2] Prematurity and the meaning of "project" are sometimes treated as distinct issues. (See *Fullerton, supra*, 32 Cal.3d at p. 797 [after finding agency action to be project, court considers "closer question" of prematurity].) Here, however, they merge for all practical purposes. The parties frame the issue as whether there is a project; their dispute in essence is over whether there is a sufficient causal relationship between the land transfer and the anticipated future development and whether enough was known about that development at the time of the transfer to allow for meaningful environmental review.

pp. 190–191.) The Court of Appeal reversed and remanded. (*Id.* at p. 196.) Among other things, it held that it could not determine from the record whether the demolition was part of a project. (*Id.* at pp. 195–196.) On remand, the trial court would have to decide whether "plans and financing" for development of public facilities at the beach had "matured into firm and specific state commitments" or, on the other hand, "future development is unspecified and uncertain." (*Id.* at p. 196.) In the latter case, the court did "not see how the return of Topanga Beach to its natural state could in itself have an adverse effect on the environment or what purpose would be served by an [environmental impact report] that could only speculate on future environmental consequences." (*Ibid.*) If the state's plans were still unspecified, then "[e]valuation of future environmental effects must await the future decisions that could cause the effects." (*Ibid.*)

Here, the Tribe has announced no plans, so there is no need for a remand to determine that future development is unspecified and uncertain. An environmental impact report would be premature, even though the Tribe likely will develop the property in some way, just as one would have been premature in *Topanga Beach* absent specific state plans, even though it was likely that the state would eventually develop public facilities at the beach.

In arguing that the land transfer was a CEQA project, FSR relies in its opening brief primarily on *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017] (*Bozung*) and in its reply brief primarily on *Fullerton, supra*, 32 Cal.3d 779. Both cases are distinguishable.

In *Bozung, supra*, 13 Cal.3d 263, the Supreme Court held that a local agency formation commission's approval of a city's annexation of land was a project. The Ventura County Local Agency Formation Commission approved the City of Camarillo's annexation of 677 acres of farmland for a contemplated development. The annexation approval was a project even though it did not grant any development rights and did not even bring about the annexation itself (the city had to take further action to annex). It was enough that the annexation approval granted the city an "entitlement for use" within the meaning of the statute. (*Id.* at pp. 268, 278–279.)

In considering whether the annexation was a project, the court in *Bozung* explicitly declined to decide whether an annexation is an activity that " 'may have a significant effect on the environment,' " asserting that this was a separate issue, relevant only to the distinct question of whether an environmental impact report was required by the terms of section 21151. (*Bozung, supra*, 13 Cal.3d at p. 278.) This might have been because, in 1975, when *Bozung* was decided, the section of CEQA defining a project (§ 21065) did not yet include the requirement that a project must be something "which may

cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (§ 21065.) That requirement was added by amendment in 1994 (Stats. 1994, ch. 1230, § 4, p. 7682), although the definition of a project in the CEQA Guidelines already included a similar requirement at the time of *Bozung*. (See *Bozung, supra*, 13 Cal.3d at p. 277, fn. 16.)

In any event, when it did turn to the question of the potential impact on the environment in order to decide whether an environmental impact report was required, the court concluded that a planning process to subdivide the land for a residential and commercial development had taken place and building was expected to go forward in the near future. That in turn " 'may have a significant effect on the environment,' " so an environmental impact report was required. (*Bozung, supra*, 13 Cal.3d at pp. 279, 281.)

It is this factual element, of course, that is lacking in this case. No planning process has taken place and no building is expected to go forward in the near future that could cause an impact on the historical resource. If the statutory definition of a project had been the same in 1975 as it is today, a known development plan and imminent construction would have been crucial considerations in determining whether the annexation was a project in *Bozung*.

In *Fullerton*, which involved the approval of a city's plan to secede from a school district, a project was present because the approval *necessitated* the construction of a high school in Yorba Linda. (*Fullerton, supra*, 32 Cal.3d at p. 797.) There is nothing comparable here. The Tribe may now have an ability it previously lacked to alter the historical resource, but nothing will compel it to do so, and future CEQA review could prevent it from doing so. This case is more like *Kaufman & Broad, supra*, 9 Cal.App.4th 464, in which the court distinguished *Fullerton* when it held that a school district's creation of a revenue-raising mechanism for possible new facilities committed the district to no particular course of action that could be subjected to environmental review. (*Id.* at p. 476.)

### B. *TPRD was not obliged to compel disclosure of plans*

FSR's brief argues that TPRD should have compelled the Tribe to present development plans before deciding to transfer the property and suggests that this compulsion could be part of a CEQA remedy in this case: TPRD "should, and easily could, have required the Tribe to publicly disclose its future development plans for the West Side Property prior to the District's final consideration of the land exchange. The District failed to carry out that duty." We know of no authority for this kind of remedy and FSR has cited none. TPRD had as much *power* to extract conditions of this kind from its buyer as

any other seller in a real estate transaction has, but it did not have a *duty* to extract them. We do not think CEQA compels public agencies, or empowers petitioners, to force property owners to create or disclose development plans for the purpose of accelerating environmental review. At least it does not do that under the circumstances presented here.

### C. *CEQA review was not improperly avoided or transferred*

FSR also points out that, after selling the land, "there is no other occasion on which [TPRD] would have the opportunity to perform CEQA review regarding the consequences of that action." Future review of the Tribe's development plans will be the responsibility of another agency, namely the County of Tuolumne. (Tuolumne City is unincorporated.) This means, according to FSR, that TPRD has improperly avoided its last chance to carry out environmental review and transferred its CEQA responsibilities to the county.

Most of the cases discussed above in which the court found no project are different from the present case in this regard. Unlike TPRD, the agencies whose actions were challenged in most of those cases—the school district in *Kaufman & Broad*, the city in *Citizens to Enforce CEQA*, and the Department of General Services in *Topanga Beach*—would have future opportunities to engage in CEQA review if development plans became concrete. The public would not have to depend on some other agency to step in.

We identified a similar issue in *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544 [27 Cal.Rptr.3d 28]. There, Kern County passed an ordinance increasing the minimum quality of sewage sludge that could be applied to farmland in the county. The higher standards affected the methods that sanitation districts could use to process sewage in the first place and altered the environmental impacts of those methods. Affected sanitation districts sued, arguing that adoption of the ordinance was a project requiring CEQA review. (127 Cal.App.4th at pp. 1557–1558.) We agreed, rejecting the argument that CEQA review would have been premature and could have been undertaken later. The case was unlike *Kaufman & Broad* because, after adopting the ordinance, the county was not going to take any further action that could trigger CEQA review and so would have no future chance to engage in CEQA review. (*County Sanitation, supra,* 127 Cal.App.4th at pp. 1600–1602.) We also stated that the possibility of later CEQA review by other agencies (the sanitation districts themselves) did not absolve the county of responsibility for undertaking its

own review at the only time it could, the time of adoption of the ordinance. (127 Cal.App.4th at pp. 1602–1603.)

■ Here, however, we do not believe the fact that another agency will carry out any future CEQA review of the Tribe's plans means that TPRD must engage in CEQA review now. The fact that future review will have to be performed by another agency cannot convert a meaningless review process into a meaningful one or convert a nonproject into a project.

D. *Applicability of the "fair argument" standard and the "commonsense" exemption*

FSR's brief contains a section headed, "Appellant need only show a reasonable argument that approval of the Project will result in potentially significant environmental impacts." In analyzing the meaning of "project," this section employs the "fair argument" standard used in determining when an environmental impact report is necessary. It also relies on aspects of the so-called commonsense exemption to CEQA. Application of the fair argument standard would not alter the result, and the commonsense exemption is irrelevant. Consequently, this approach does not advance FSR's cause.

■ First, FSR asserts that an activity is a project if a petitioner makes a "reasonable argument" that the activity will result in a potentially significant environmental impact. FSR states: "Once [TPRD] was presented with [FSR's] legitimate questions about the ultimate impacts of the [transfer] on the historic integrity of the Right-of-Way, . . . the burden shifted to [TPRD] to treat the [transfer] as a project . . . ." This is really just the familiar CEQA "fair argument" standard, which applies to the determination of when a project requires an environmental impact report. (See Cal. Code Regs., tit. 14, § 15064, subd. (f)(1).) Under the fair argument standard, an environmental impact report is required if there is substantial evidence that a project will have a significant effect on the environment, even if there is also substantial evidence to the contrary. (*Ibid.*)

Where the fair argument standard applies, it strongly favors environmental review, because it requires environmental review whenever substantial evidence supports it, even if other contrary substantial evidence exists. We know of no authority explaining whether or when the fair argument standard may be applicable to determining whether an activity is a project in the first place. We need not decide if it is applicable to that question in this case, because there was no project even under that standard. As we have said, the lack of announced development plans meant that no identifiable impact on the historical resource itself (as opposed to the larger Westside Lumber Company

property) was foreseeable. Substantial evidence of the impact was therefore lacking and we would hold that there was no project even if the fair argument standard were applicable.

Next, FSR attempts to apply a case involving the commonsense exemption to the question of what constitutes a project. The commonsense exemption is the following provision of the CEQA Guidelines: "Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA." (Cal. Code Regs., tit. 14, § 15061, subd. (b)(3).) FSR says the application of this exemption in *Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106 [62 Cal.Rptr.2d 612] (*Davidon Homes*) supports the conclusion that the property transfer in this case was a project.

In *Davidon Homes*, the court considered a San Jose ordinance providing that a moratorium on certain hillside developments would be lifted only after invasive geological testing determined the hillside's vulnerability to landslides. Opponents asserted that the testing was a CEQA project and could not be done without environmental review. The city rejected this assertion and passed the ordinance without performing CEQA review. A preamble recited that the testing was categorically exempt from CEQA under the commonsense exemption. (*Davidon Homes, supra*, 54 Cal.App.4th at pp. 110–111.) The trial court denied the opponents' petition for a writ of mandate. (*Id.* at p. 112.)

The Court of Appeal reversed. It held that the opponents had made a reasonable argument suggesting that a significant environmental impact was possible. The commonsense exemption would apply only if the city then showed with certainty that there was no possibility of a significant impact. The record lacked substantial evidence to show this, so the exemption did not apply and the Court of Appeal ordered the trial court to grant the petition. (*Davidon Homes, supra*, 54 Cal.App.4th at pp. 118–119.)

Although TPRD has never claimed a categorical exemption, FSR attempts to analogize the present case to *Davidon Homes* by saying that it made a reasonable argument suggesting that a significant environmental impact was possible, so TPRD then had the burden of showing that no such impact was possible. The record does not show this with certainty, FSR contends, so TPRD should have undertaken environmental review.

■ FSR's mistake is one of logic. The commonsense exemption means that *no activity is a CEQA project if* it has no possibility of significantly affecting the environment. It does not follow that *every activity is a CEQA project unless* it has no possibility of significantly affecting the environment.

Some activities are not projects because no identifiable environmental change is reasonably foreseeable, even though it cannot be said with certainty that no significant environmental change is possible. The land transfer in this case, like the community facilities district approval in *Kaufman & Broad* and the beach house demolitions in *Topanga Beach*, is one of those activities.

### E. *The possibility of a future federal trust does not make the transfer a project*

FSR contends that transferring the land to the Tribe is a project because, under federal regulations, the Tribe can apply to the Bureau of Indian Affairs to place the land in trust. (See 25 C.F.R. § 151.1 et seq. (2006).) This, FSR argues, would mean the land could no longer be regulated by state and local authorities. Future CEQA review would be rendered impossible. (See *Friends of East Willits Valley v. County of Mendocino* (2002) 101 Cal.App.4th 191, 201 [123 Cal.Rptr.2d 708] ["Courts applying [28 U.S.C.] section 1360 consistently have found federal preemption of state and county regulation of trust land"].)

Assuming that this is a genuine possibility, it still does not convert the transfer into a CEQA project. The risk FSR points out exists every time an environmentally significant resource is transferred out of the control of a public agency. The transferee, Indian tribe or not, always might take action that could interfere with future CEQA review. It could, for instance, sell the land to the federal government or to an Indian tribe. This does not mean that every transfer away from public agency ownership is a project. Nothing in the record makes it particularly likely that the Tribe will request trust status for the right-of-way or that a request would be granted.

FSR relies on *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165 [105 Cal.Rptr.2d 214, 19 P.3d 567] (*Friends of Sierra Madre*) and *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105 [65 Cal.Rptr.2d 580, 939 P.2d 1280] (*Mountain Lion Foundation*) in claiming that the transfer was a project because it changed the "status" of the property "from protected to potentially unprotected." Both cases are distinguishable.

In *Friends of Sierra Madre*, a city ordinance removed 29 properties from the city's register of historic landmarks. (*Friends of Sierra Madre, supra,* 25 Cal.4th at pp. 177–178.) The Supreme Court affirmed a judgment of the Court of Appeal stating that delisting historic properties was a CEQA project because it "led to a change in legal status removing the evidentiary presumption of Public Resources Code section 21084.1 that a listed structure is a historically or culturally significant resource." (*Friends of Sierra Madre, supra,* 25 Cal.4th at pp. 181, 196.) In *Mountain Lion Foundation*, the court

held that removal of species from the endangered and threatened species lists is not categorically exempt from CEQA because that removal "withdraws existing levels of protection." (*Mountain Lion Foundation, supra,* 16 Cal.4th at p. 124.)

First, of these two cases, only *Friends of Sierra Madre* is relevant to the issue at hand. *Mountain Lion Foundation* deals with categorical exemptions, not with the definition of a project. TPRD does not argue that the transfer of real property or of historical resources by public agencies to other parties is categorically exempt from CEQA, but only that this particular transfer was not a CEQA project.

Second, *Friends of Sierra Madre* does not show that the transfer was a project. The transfer was a change in ownership, not a change in protected status. It may constitute a change in vulnerability to a change in protected status, but we do not think that kind of change in vulnerability is a project. Transferring property to an Indian tribe is not a project under the present circumstances because it is too many steps removed from any actual impact. The first step is the transfer. The second and third are the requesting and granting of trust status. The fourth is the implementation (after any remaining applicable federal or state environmental review) of a development plan that would have an effect on the right-of-way. Further, even assuming these things will happen, the actual impact is still unknown. The causal element of the statutory definition of a project—the activity "may cause" a "reasonably foreseeable indirect physical change in the environment" (§ 21065)—is broad, but we do not think it encompasses this situation. The causal distance between the ordinance in *Friends of Sierra Madre* and an actual specific impact on a historical resource was substantial, but it was not as great as the distance here.

For all these reasons, we conclude that TPRD's decision to transfer the right-of-way to the Tribe was not a project within the meaning of CEQA. As what we have already said suggests, we do not hold that a public agency's alienation of real property it wishes to dispose of is never a CEQA project. To the contrary, the CEQA Guidelines imply that an agency's disposal of surplus property can sometimes be a project. Surplus government property sales are categorically exempt if the property has no significant environmental value and certain other conditions are satisfied. (Cal. Code Regs., tit. 14, § 15312.) This implies that, in other circumstances, a surplus government property sale can be a project. Like any other agency action, property disposal—even of a historical resource—is not a project if too little is known about environmental impacts to which it might lead to allow those impacts to be meaningfully analyzed.

## *DISPOSITION*

The judgment is affirmed. Respondents shall be awarded their costs on appeal.

Vartabedian, Acting P. J., and Gomes, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 9, 2007, S151171.