Filed 10/14/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| UNION OF MEDICAL MARIJUANA PATIENTS, INC., | D068185 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2014-00013481-CU-TT-CTL) |
| CITY OF SAN DIEGO, | |
| Defendant and Respondent; | |
| CALIFORNIA COASTAL COMMISSION, | |
| Real Party in Interest. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Channel Law Group, Julian K. Quattlebaum and Jamie T. Hall for Plaintiff and Appellant.

Jan I. Goldsmith, City Attorney, and Glenn T. Spitzer, Deputy City Attorney, for Defendant and Respondent.

Union of Medical Marijuana Patients, Inc. (UMMP) appeals from the trial court's judgment denying its petition for writ of mandate, which challenged the City of San Diego's (the City) enactment of an ordinance adopting regulations for the establishment and location of medical marijuana consumer cooperatives in the City. UMMP contends that the City did not comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] when enacting the ordinance. As we will explain, we conclude that the ordinance did not constitute a project within the meaning of CEQA, and accordingly the City was not required to conduct an environmental analysis prior to enacting the ordinance. We therefore affirm the judgment.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *The City's Adoption of Ordinance No. O-20356*

For several years, state law has contained provisions concerning the use and cultivation of medical marijuana. Specifically, "the Compassionate Use Act of 1996 (. . . ; Health & Saf. Code, § 11362.5, added by initiative, Prop. 215, as approved by voters, Gen. Elec. (Nov. 5, 1996)) and the more recent Medical Marijuana Program (. . . ; [Health & Saf. Code,] § 11362.7 et seq., added by Stats. 2003, ch. 875, § 2, p. 6424) have removed certain state law obstacles from the ability of qualified patients to obtain and use marijuana for legitimate medical purposes." (*City of Riverside v. Inland Empire Patients*

---

[1]      Unless otherwise indicated, all further statutory references are to the Public Resources Code.

2

*Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729, 737, fn. omitted (*City of*

*Riverside*).)[2] One purpose of the Medical Marijuana Program Act (hereafter MMP) "was

to '[e]nhance the access of patients and caregivers to medical marijuana through

collective, cooperative cultivation projects.' (Stats. 2003, ch. 875, § 1(b)(3), pp. 6422,

6423.) Accordingly, the MMP provides, among other things, that '[q]ualified patients . . .

and the designated primary caregivers of qualified patients . . . , who associate within the

State of California in order collectively or cooperatively to cultivate [cannabis][3] for

medical purposes, shall not solely on the basis of that fact be subject to state criminal

sanctions under [Health and Safety Code sections] 11357 [(possession)], 11358

[(cultivation, harvesting, and processing)], 11359 [(possession for sale)], 11360

[(transportation, sale, furnishing, or administration)], 11366 [(maintenance of place for

purpose of unlawful sale, use, or furnishing)], 11366.5 [(making place available for

purpose of unlawful manufacture, storage, or distribution)], or 11570 [(place used for

unlawful sale, serving, storage, manufacture, or furnishing as statutory nuisance)].'

([Health & Saf. Code,] § 11362.775.)" (*City of Riverside*, at pp. 739-740.) Under the

MMP, as amended in 2011 (Stats. 2011, ch. 196, § 1), a city or other local governing

body is expressly authorized to "[a]dopt[] local ordinances that regulate the location,

---

2     More recently, after the City's enactment of the ordinance at issue here, the
Legislature passed the Medical Cannabis Regulation and Safety Act (Bus. & Prof. Code,
§ 19300 et seq.), which became effective in 2016 and regulates the licensing of medical
cannabis commercial activity.

3     In 2015, the Legislature replaced the word "marijuana" in Health and Safety Code,
section 11362.775 with the word "cannabis." (Stats. 2015, ch. 689, § 6.)

operation, or establishment of a medical marijuana cooperative or collective" in its jurisdiction.  (Health & Saf. Code, § 11362.83, subd. (a).)

In April 2013, the City Council directed the City Attorney to develop an ordinance to allow medical marijuana facilities in the City.  On December 5, 2013, the Planning Commission held a noticed public hearing on the issue and recommended that the City adopt an interim ordinance.  The City Council held public hearings and finally adopted Ordinance No. O-20356 on March 11, 2014 (the Ordinance).

The Ordinance amends several parts of the City's municipal code to regulate the establishment and location of medical marijuana consumer cooperatives.  The ordinance defines the term "medical marijuana consumer cooperative" to mean "a facility where marijuana is transferred to qualified patients or primary caregivers in accordance with the Compassionate Use Act of 1996 and the [MMP]," and specifically states that the enacted regulations "are intended to apply to commercial retail facilities."

The Ordinance provides that medical marijuana consumer cooperatives (cooperatives) may be permitted with a conditional use permit in certain zones in the City, including certain commercial and industrial zones, provided that no more than four medical marijuana consumer cooperatives are located in each of the City's nine City Council districts (council districts) and that they are located 1,000 feet from public parks, churches, childcare centers, playgrounds, minor-oriented facilities, residential care facilities, schools and other cooperatives, and 100 feet from residential zones.  The ordinance also requires that the cooperatives follow certain requirements for lighting, security, signage and operating hours, among other things.

4

The City engaged the mapping and data services of SANDAG to perform an analysis of where in the City the cooperatives could locate in light of the specific restrictions set forth in the Ordinance. SANDAG's analysis showed that even though the Ordinance theoretically allows a total of 36 cooperatives (four in each of the nine council districts) only a maximum of 30 cooperatives could actually be located in the City, with one of the nine council districts not being able to accommodate any cooperative, and two of the nine council districts being able to accommodate only three cooperatives instead of four. A map in the record also shows where the cooperatives could be located throughout the City, showing them spread across many geographic areas.

B.      *UMMP's CEQA Argument to the City*

Prior to the enactment of the Ordinance, UMMP submitted two letters to the City. The letters argued that the enactment of the Ordinance was a "project" as defined in CEQA and was otherwise not exempt, requiring the City to perform an initial study of possible environmental impacts before enacting the Ordinance. Based on a printout of an Internet page from marijuana advocacy organization "Cal. NORML" dated in 2011, UMMP stated that an estimated 2 percent to 3 percent of the overall population in California are medical marijuana patients, meaning that an estimated 26,451 medical marijuana patients resided in the City, given its population. Further, UMMP assumed, without citation, that there were already "at least 30 Cooperatives operating in the City" on an illegal basis. According to UMMP, the enactment of the Ordinance could cause a negative environmental impact because it would "require[] thousands of patients to drive across the City to obtain their medicine because the Cooperatives are only allowed in

5

certain limited places in the City," resulting in "traffic and air pollution." Further, UMMP claimed that if "the [c]ooperatives are significantly reduced in number," patients may decide to "establish . . . home cultivation sites in the City," with "potential significant environmental effects." In support of this argument, UMMP attached articles describing the environmental impact of large-scale indoor marijuana cultivation, including the high energy consumption associated with such operations. Finally, UMMP briefly argued that enactment of the Ordinance would result in "development" being "shifted" to certain areas of the City, causing a negative environmental impact.

In its communication to the City Council requesting approval of the Ordinance, the City's Development Services Department concluded that the Ordinance was not subject to CEQA: "The . . . Ordinance is not subject to [CEQA] pursuant to CEQA Guidelines Section 15060(c)(3),[4] in that it is not a Project as defined by the CEQA Guidelines Section 15378. Adoption of the ordinance does not have the potential for resulting in either a direct physical change in the environment or a reasonably foreseeable

---

4    The term CEQA Guidelines "refers to the regulations for the implementation of CEQA authorized by the Legislature (. . . § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations, and 'prescribed by the Secretary of Resources to be followed by all state and local agencies in California in the implementation of [CEQA].' ([Cal Code Regs., tit. 14], § 15000.) In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2 (*Muzzy Ranch*).)
     Section 15060, subdivision (c) of the CEQA Guidelines, cited in the staff communication to City Council, states that "[a]n activity is not subject to CEQA if: [¶] . . . [¶] (3) The activity is not a project as defined in Section 15378." (Cal. Code Regs., tit. 14, § 15060, subd. (c).)

6

indirect physical change in the environment. Further projects subject to the ordinance will require a discretionary permit and CEQA review, and will be analyzed at the appropriate time in accordance with CEQA." Apparently agreeing with this analysis, the City Council enacted the Ordinance without performing any further review under CEQA.

C.      *UMMP's Petition for Writ of Mandate*

UMMP filed a petition for writ of mandate against the City on April 29, 2014.[5] UMMP alleged that the City failed to proceed in the manner required by law when it concluded that the Ordinance was not a project requiring the City to prepare an initial study analyzing environmental impacts under CEQA. UMMP alleged in the petition that the Ordinance is a project with the potential to result in a change to the environment because it (1) will cause patients to drive across the City, increasing traffic and air pollutants; (2) will shift or intensify development to certain areas of the City; and (3) could increase the indoor cultivation of marijuana, which will have negative environmental impacts.

---

[5]      UMMP's petition also named the California Coastal Commission as a real party in interest, alleging that "[b]ecause the Ordinance applies to areas of the City near the shoreline, the Coastal Commission must approve the Ordinance." In the trial court, the California Coastal Commission asserted that it was improperly named as a party because the petition alleged no basis for its interest in the matter. The trial court declined to address that issue in its ruling, as it denied UMMP's petition on substantive grounds. On appeal, the California Coastal Commission filed a letter stating that it would not be filing a respondent's brief, as it "was unnecessarily named as a real party-in-interest in the superior court proceedings." As in the trial court, UMMP makes no argument on appeal to support its inclusion of the California Coastal Commission in the writ proceeding. Accordingly, we do not address any issues specifically concerning that entity.

7

After considering the parties' briefing, the trial court denied UMMP's petition, holding that the adoption of the Ordinance was not a project subject to CEQA review,[6] and it entered judgment in favor of the City. UMMP appeals from the judgment.

II.

DISCUSSION

A.    *Applicable Legal Principles*

"CEQA and its implementing administrative regulations . . . establish a three-tier process to ensure that public agencies inform their decisions with environmental considerations. . . .  The first tier is jurisdictional, requiring that an agency conduct a preliminary review to determine whether an activity is subject to CEQA. ([Cal. Code Regs., tit. 14, ]§ 15060; see . . . § 21065.) An activity that is not a 'project' as defined in the Public Resources Code (see § 21065) and the CEQA Guidelines (see [Cal. Code Regs., tit. 14, ]§ 15378) is not subject to CEQA. ([Cal. Code Regs., tit. 14, ]§ 15060, subd. (c)(3).)" (*Muzzy Ranch*, *supra*, 41 Cal.4th at pp. 379-380, citations & fn. omitted.) Conversely, "[i]f an action is a 'project' within the meaning of CEQA and not exempt, a public agency intending to approve it must first engage in environmental review, meaning that an environmental impact report or a negative declaration (explaining why no environmental impact report is necessary) must be prepared and must be considered by the agency. (Cal. Code Regs., tit. 14, § 15004, subd. (a).)" (*Friends of the Sierra*

---

6    The trial court also rejected the City's argument that UMMP lacked standing to bring the petition. The City does not challenge that ruling, and we accordingly do not address the issue of UMMP's standing.

8

*Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, 653

(*Friends of Sierra Railroad*).)  The sole issue presented on appeal is whether the City

improperly determined that adoption of the Ordinance did not constitute a project within

the meaning of CEQA.

Central to the issue of whether the City's adoption of the Ordinance constitutes a

project subject to CEQA, both CEQA and the CEQA Guidelines contain express

definitions of the term "project."

As set forth in CEQA:

" 'Project' means an activity which may cause either a direct physical
change in the environment, or a reasonably foreseeable indirect physical
change in the environment, and which is any of the following:

"(a)    An activity directly undertaken by any public agency.

"(b)    An activity undertaken by a person which is supported, in whole or
in part, through contracts, grants, subsidies, loans, or other forms of
assistance from one or more public agencies.

"(c)    An activity that involves the issuance to a person of a lease, permit,
license, certificate, or other entitlement for use by one or more public
agencies."  (§ 21065.)

The CEQA Guidelines provide in relevant part:

"(a)    'Project' means the whole of an action, which has a potential for
resulting in either a direct physical change in the environment, or a
reasonably foreseeable indirect physical change in the environment, and
that is any of the following:

"(1)    An activity directly undertaken by any public agency including but
not limited to public works construction and related activities clearing or
grading of land, improvements to existing public structures, enactment and
amendment of zoning ordinances, and the adoption and amendment of local
General Plans or elements thereof pursuant to Government Code Sections
65100-65700.

9

"(2)  An activity undertaken by a person which is supported in whole or in part through public agency contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.

"(3)  An activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."  (Cal. Code Regs., tit. 14, § 15378.)

Our Supreme Court has stressed that "[w]hether an activity constitutes a project subject to CEQA is a *categorical question* respecting whether the activity is of a general kind with which CEQA is concerned, without regard to whether the activity *will actually have* environmental impact."  (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381, italics added & citation omitted.)  The question is whether the public agency's activity is "*the sort of activity* that may cause a direct physical change or a reasonably foreseeable indirect physical change in the environment . . . so as to constitute a project."  (*Id*. at p. 382, italics added & citation omitted.)

" 'Ordinances passed by cities are clearly activities undertaken by a public agency and thus *potential* "projects" under CEQA.' "  (*Union of Medical Marijuana Patients, Inc. v. City of Upland* (2016) 245 Cal.App.4th 1265, 1272 (*City of Upland*).)  Based on this well-established principle, the City does not dispute that the Ordinance meets *part* of the definition of project as set forth in CEQA in that it constitutes "[a]n activity directly undertaken by any public agency."  (§ 21065.)  However, the City contends that the enactment of the Ordinance nevertheless does not qualify as a project because there is no basis to conclude that it "may cause either a *direct* physical change in the environment, or

10

a reasonably foreseeable *indirect* physical change in the environment."  (§ 21065, italics added.)

UMMP does not attempt to argue that the Ordinance will cause a *direct* physical change in the environment.[7]  Thus, the issue in dispute reduces to whether the enactment may cause "a reasonably foreseeable *indirect* physical change in the environment."[8] (§ 21065.)

In reviewing whether a public agency has complied with CEQA, a court's inquiry extends only to "whether there was a prejudicial abuse of discretion" by the agency. (§ 21168.5.)  "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."  (*Ibid*.)

"Whether an activity is a project is an issue of law that can be decided on undisputed data in the record on appeal" (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381), and

---

[7]    As the CEQA Guidelines explain, "A direct physical change in the environment is a physical change in the environment which is caused by and immediately related to the project.  Examples of direct physical changes in the environment are the dust, noise, and traffic of heavy equipment that would result from construction of a sewage treatment plant and possible odors from operation of the plant."  (Cal. Code Regs., tit. 14, § 15064, subd. (d)(1).)

[8]    The CEQA Guidelines state that "[a]n indirect physical change in the environment is a physical change in the environment which is not immediately related to the project, but which is caused indirectly by the project.  If a direct physical change in the environment in turn causes another change in the environment, then the other change is an indirect physical change in the environment.  For example, the construction of a new sewage treatment plant may facilitate population growth in the service area due to the increase in sewage treatment capacity and may lead to an increase in air pollution."  (Cal. Code Regs., tit. 14, § 15064, subd. (d)(2).)

we therefore decide the issue presented here as a matter of law. "[T]hus the present appeal presents no question of deference to agency discretion or review of substantiality of evidence." (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 795.)

"In a CEQA case, as in other mandamus cases, our review of the administrative record for error is the same as the trial court's; we review the agency's action, not the trial court's decision." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381.) "Throughout, we must bear in mind that '[t]he foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' " (*Ibid*.)

B.    *The Enactment of the Ordinance Does Not Constitute a Project as Matter of Law as a Type of Zoning Ordinance*

UMMP's first contention is that because the Ordinance is a type of zoning ordinance, its enactment constitutes a project, *as a matter of law* even without a determination that the Ordinance may cause a physical change in the environment.

UMMP relies on a provision of CEQA stating that "[e]xcept as otherwise provided in this division, this division[9] shall apply to discretionary projects proposed to be carried out or approved by public agencies, including, but not limited to, *the enactment and amendment of zoning ordinances*, the issuance of zoning variances, the issuance of

---

9    "[T]his division" refers to division 13 of the Public Resources Code, which is titled "Environmental Quality" and which contains the full text of CEQA. (§ 21050 ["This division shall be known and may be cited as the California Environmental Quality Act."].)

conditional use permits, and the approval of tentative subdivision maps unless the project is exempt from this division."  (§ 21080, subd. (a), italics added.)  According to UMMP, because this provision refers to "the enactment and amendment of zoning ordinances" (*ibid*.) as an example of a discretionary project carried out or approved by a public agency, *any* enactment of a zoning ordinance by a public agency *necessarily* constitutes a project.  Assuming that the Ordinance is a type of zoning ordinance, UMMP concludes that the Ordinance constitutes a project *necessarily* subject to CEQA.

UMMP's argument relies on two fundamental assumptions:  (1) based on the text of section 21080, subdivision (a), *any* zoning ordinance is *necessarily* a project; and (2) the Ordinance is a type of "zoning ordinance[]" as the term is used in that statute.  As we will explain, to reject UMMP's argument, we need only examine the first assumption, and we do not, and need not, comment on UMMP's second assumption.

In evaluating UMMP's interpretation of section 21080, subdivision (a), we begin with the general rule of statutory interpretation that "a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.  A construction making some words surplusage is to be avoided." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387.)  "A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision . . . ."  (*San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 577.)

Turning to the statutory language, section 21080, subdivision (a) identifies two essential characteristics of an activity covered by CEQA: (1) they are "discretionary projects" and (2) they are "proposed to be carried out or approved by public agencies." Section 21080, subdivision (a) then sets forth several examples of covered activities, "including, but not limited to, the enactment and amendment of zoning ordinances." This language is ambiguous. It could mean *either* (1) that the examples given (including "the enactment and amendment of zoning ordinances") are illustrations of activities that are "discretionary projects proposed to be carried out or approved by public agencies," *or* it could mean that the examples given are illustrations of activities "proposed to be carried out or approved by public agencies," but that not all such activities will qualify as "discretionary projects." (*Ibid*.) Case law has acknowledged this ambiguity in the statutory language, noting that one arguable reading is that "subdivision (a) of section 21080 establishes a bright-line rule of law that all enactments of zoning ordinances are discretionary projects." (*Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273, 286 (*Wal-Mart*).) UMMP argues that we should adopt that bright-line rule here, and conclude as a matter of law that all enactments of zoning ordinances necessarily constitute projects.

We reject the bright-line rule advocated by UMMP because section 21080, subdivision (a) does not stand alone within CEQA and should not be read in isolation. Indeed, section 21080, subdivision (a) expressly states that its provisions apply "[e]xcept as otherwise provided [in CEQA]." A specific provision in CEQA explaining the meaning of the term project is found in section 21065. That provision defines a project

14

as having two parts: (1) "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment"; and (2) "[a]n activity directly undertaken by any public agency" or other enumerated types of activities involving a public agency. (*Ibid*.) Harmonizing this more specific provision defining a project with the more general provision in section 21080, subdivision (a), the most reasonable interpretation is that "the enactment and amendment of zoning ordinances" referred to in section 21080, subdivision (a) is an illustration of "[a]n activity directly undertaken by any public agency" as set forth in section 21065, but that the enactment or amendment of a zoning ordinance will not constitute a CEQA project unless it *also* meets the second requirement in section 21065, namely that it "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment."

Not only is this the most reasonable way to harmonize the two statutory provisions, it is also the interpretation set forth in the CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15378.) As set forth in the CEQA Guidelines, a "project" is an action "which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, *and* that is any of the following: [¶] (1) An activity directly undertaken by any public agency including but not limited to . . . enactment and amendment of zoning ordinances" and other enumerated categories of activities involving public agencies. (*Ibid*., italics added.) Clearly, the CEQA Guidelines interpret CEQA's statutory provisions as having two separate and independent requirements for an action to constitute a project: (1) there

15

must be a potential for a change in the environment caused by the action, *and* (2) the action must fit into certain enumerated categories of activities involving public agencies, including "[a]n activity directly undertaken by any public agency." Crucially, the CEQA Guidelines identify the "enactment and amendment of zoning ordinances" as an illustration of only the *second* requirement, as a type of "activity directly undertaken by any public agency." (*Ibid*.) Thus, under the CEQA Guidelines, the enactment and amendment of a zoning ordinance is a project *only if* that action *also* creates "a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (*Ibid*.) The CEQA Guidelines thus plainly reject the bright-line rule advocated by UMMP, under which the enactment of a zoning ordinance is *necessarily* a project under CEQA, regardless of whether there is *also* the potential for a change in the environment.

We are required to "accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380, fn. 2.) Here, as we have explained, the statutory interpretation adopted by the CEQA Guidelines is not clearly unauthorized and is not clearly erroneous, as that interpretation is a reasonable way of harmonizing CEQA's statutory provisions. Therefore, we perceive no reason to depart from the CEQA Guidelines in determining whether any zoning ordinance is necessarily a "project."

We are not alone in observing that the CEQA Guidelines adopt a statutory interpretation in which the adoption of a zoning ordinance is not necessarily a project unless there is *also* a potential for a physical change in the environment. In *Wal-Mart*,

16

*supra*, 138 Cal.App.4th 273, although acknowledging that for the purpose of its opinion it did not need to resolve whether "subdivision (a) of section 21080 establishes a bright-line rule of law that all enactments of zoning ordinances are discretionary projects regardless of whether all of the requisite elements contained in section 21065's definition of a 'project' have been met" (*id*. at p. 286), the court nevertheless discussed the issue in a footnote. As *Wal-Mart* pointed out, "[s]ections 21065 and 21080 could be construed to mean that the enactment of a zoning ordinance is not automatically a project and will not be a project unless all of the essential elements for a project contained in section 21065 are met. Under this view, the qualifying language at the beginning of subdivision (a) of section 21080, which states that '[e]xcept as otherwise provided in [CEQA],' would be construed to mean that all of the essential elements for a project contained in section 21065 are 'otherwise provided in [CEQA]' and are not eliminated by the language in section 21080 that states discretionary projects include the enactment of zoning ordinances. If such a construction were adopted, courts could not presume that the enactment of a zoning ordinance 'may cause . . . a . . . physical change in the environment' (§ 21065), but would have to review the administrative record for evidence establishing both the requisite causal link as well as the requisite physical change in the environment. Under this construction, the main significance of subdivision (a) of section 21080 would be limiting the applicability of CEQA to *discretionary* projects. [¶] . . . The [CEQA] Guidelines . . . have melded the provisions of subdivision (a) of section 21080 into the definition of 'project' . . . and, thus, appear to have rejected by implication

17

a bright-line rule that all zoning amendments are projects." (*Id.* at p. 286, fn. 7, citations omitted.)

UMMP relies on *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690 (*Rominger*) in support of its argument that, based on section 21080, subdivision (a), the enactment of a zoning ordinance constitutes a "project." In *Rominger*, the issue was whether the county's approval of a tentative subdivision map constituted a project subject to CEQA. (*Rominger*, at p. 701.)[10] The appellants in *Rominger* argued that because section 21080 specifically identified " 'the approval of tentative subdivision maps' " among the discretionary projects covered by CEQA, any approval of a tentative subdivision map was necessarily a CEQA project. (*Id.* at p. 702.) The *Rominger* court agreed. As it explained, "by enacting subdivision (a) of section 21080 the Legislature has determined that certain activities, including the approval of tentative subdivision maps, *always* have at least the *potential* to cause a direct physical change or a reasonably foreseeable indirect physical change in the environment. This makes sense. It virtually goes without saying that the purpose of subdividing property is to facilitate its use and development. . . . Presumably no one goes to the trouble of subdividing property just for the sake of the process; the goal of subdividing property is to make that property more useable. And with the potential for greater or different use comes the potential for environmental impacts from that use. Thus, the [appellants] are correct that under

---

10    UMMP incorrectly states that *Rominger* constitutes "binding precedent." We are not bound by the opinion of another intermediate appellate court. (*McGlothlen v. Department of Motor Vehicles* (1977) 71 Cal.App.3d 1005, 1017.)

18

subdivision (a) of section 21080, the approval of a tentative subdivision map is categorically a CEQA project." (*Ibid*., citations omitted.) UMMP argues that the same analysis should apply here to the issue of whether the enactment and amendment of a zoning ordinance is *categorically* a CEQA project, regardless of whether it has the potential for resulting in physical change to the environment, as "the enactment and amendment of zoning ordinances" appears alongside "the approval of tentative subdivision maps" in section 21080, subdivision (a).

To the extent *Rominger*, *supra*, 229 Cal.App.4th 690, interprets CEQA to mean that *each* activity listed in section 21080, subdivision (a) necessarily constitutes a CEQA project, regardless of whether it *also* has the potential for resulting in a physical change to the environment, we disagree with *Rominger* and do not find its analysis to be persuasive. *Rominger*'s analysis ignores the definition of a project as set forth in CEQA and the CEQA Guidelines. As we have explained, a focus on those provisions leads us to conclude the activities identified in section 21080, subdivision (a) do not qualify as CEQA projects unless they *also* have the potential for resulting in a physical change to the environment.[11]

_____

[11] We note that *Rominger*, *supra*, 229 Cal.App.4th 690, dealt specifically with the issue of whether the approval of a *tentative subdivision map* is necessarily a CEQA project, which is different from the issue of whether the *enactment or amendment of a zoning ordinance* is necessarily a CEQA project. Although we disagree with *Rominger*'s conclusion that section 21080 establishes that certain categories of public agency activities will always *necessarily* qualify as projects under CEQA, we express no opinion on whether the approval of a tentative subdivision map is the type of activity that, because of its nature, will normally constitute a CEQA project when a public agency applies the definition of a project as set forth in section 21065.

UMMP also contends that *Muzzy Ranch*, *supra*, 41 Cal.4th 372, supports its argument for reading section 21080, subdivision (a) as creating a categorical rule that the enactment or amendment of zoning ordinances are always CEQA projects. However, *Muzzy Ranch* does not provide support for that argument because it did not discuss or interpret section 21080, subdivision (a). *Muzzy Ranch* considered the issue of whether an airport land use compatibility plan was a project covered by CEQA by relying on the definitions of project contained in section 21065 and the CEQA Guidelines, not by referring to section 21080, subdivision (a). Although *Muzzy Ranch* refers to the issue of whether an activity constitutes a project under CEQA as being a "categorical question" that looks to whether the "sort of activity" at issue has the potential to result in a physical change to the environment regardless of "whether the activity will actually have environmental impact" (*Muzzy Ranch*, at pp. 381, 382), it does not endorse looking to section 21080, subdivision (a) as a way to determine whether a specific activity categorically qualifies as a project.[12]

---

[12]    Quoting *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 750, which states that the "purpose of a zoning law is to regulate the *use* of land," UMMP argues that it "makes sense that zoning ordinances are the types of activities that have at least the potential to cause a direct physical change or a reasonably foreseeable indirect physical change in the environment." We are not persuaded by this argument, as not all laws that a party may choose to label as a "zoning ordinance" because they touch upon the use of land will necessarily present the kind of potential impacts to the environment that will qualify them as projects under CEQA.

C.  *The Enactment of the Ordinance Will Not Result in a Reasonably Foreseeable Indirect Physical Change in the Environment*

Having rejected UMMP's argument that the enactment of the Ordinance constitutes a CEQA project as a matter of law, we turn to the issue of whether the enactment of the Ordinance meets the definition of a project contained in CEQA. Specifically, as we have explained, the issue before us is whether the enactment of the Ordinance meets the definition of a project in that it "may cause . . . a reasonably foreseeable indirect physical change in the environment." (§ 21065.) Further, as noted, the issue of whether the Ordinance meets the definition of a project is a question of law that we decide based on undisputed facts in the record. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381.)

Under the CEQA Guidelines, "[a] change which is speculative or unlikely to occur is not reasonably foreseeable." (Cal. Code Regs., tit. 14, § 15064, subd. (d)(3).) If concerns about physical changes in the environment resulting from an ordinance are "too 'speculative or unlikely' to be considered 'reasonably foreseeable,' " then the ordinance is "not a project subject to CEQA." (*City of Upland*, *supra*, 245 Cal.App.4th at p. 1276.) When the potential physical changes that may be caused by a public agency's activity are unduly speculative, the issue of whether that activity constitutes a project for purposes of CEQA, may "merge for all practical purposes" with the issue of whether it is premature to conduct an environmental review. (*Friends of Sierra Railroad*, *supra*, 147 Cal.App.4th at p. 657, fn. 2.)

As we are assessing whether the enactment of the Ordinance "may cause . . . a reasonably foreseeable indirect *physical change* in the environment" (§ 21065, italics added), it is important understand that "a physical change is identified by comparing *existing* physical conditions with the physical conditions that are predicted to exist at a later point in time, after the proposed activity has been implemented. . . .  The difference between these two sets of physical conditions is the relevant physical change." (*Wal-Mart*, *supra*, 138 Cal.App.4th at p. 289, citations & fn. omitted.)  Put simply, "[t]he correct analysis of the relevant physical change in the environment involves a comparison of (1) the physical conditions that existed at the time the Ordinance was proposed or approved with (2) forecasts of reasonably foreseeable future conditions that may occur as a result of the adoption of the Ordinance."  (*Id*. at pp. 290-291, fn. omitted.)  " '[T]he comparison must be between existing physical conditions without the [project] and the conditions expected to be produced by the project.' "  (*CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 504.)

Further, it is important to keep in mind that, as our Supreme Court has explained, in assessing whether the enactment of the Ordinance is a project within the meaning of CEQA, courts must take a "categorical" approach.  (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381.)  Thus, to the extent possible, we examine generally whether the enactment of a law allowing the operation of medical marijuana cooperatives in certain areas of a municipality under certain conditions is the type of activity that may cause a reasonably foreseeable change to the environment.

UMMP identifies three categories of possible physical changes to the environment that are reasonably foreseeable to result from the enactment of the Ordinance: (1) increased travel, resulting in air pollution and traffic; (2) increased building development with impacts on the environment; and (3) increased indoor cultivation of marijuana, which has negative environmental impacts. We consider each category in turn to determine whether the enactment of the Ordinance is the type of activity that may cause a reasonably foreseeable indirect physical change in the environment.

1. *Increased Travel*

UMMP's first contention is that because of "restrictions regarding where [cooperatives] may be located in the City," patients will "be forced to travel to [cooperatives] far from where they reside, creating traffic and air pollution." UMMP asserts that "[e]vidence in the [r]ecord clearly demonstrates that patients will have to travel great distances to visit [cooperatives] outside the City as a result of the Ordinance."

UMMP's argument relies on a fundamental assumption that is unsupported by evidence and is unduly speculative. As its basic factual premise, UMMP assumes that it will be more burdensome for patients to travel to medical marijuana cooperatives after the enactment of the Ordinance. We find no support in the administrative record, or in logic, for that assumption.

As an initial matter, we note that prior to the enactment of the Ordinance, there were no legally operating medical marijuana cooperatives in the City whatsoever. As UMMP observes, a number of cooperatives were operating illegally prior to the Ordinance, without the permission of the City. The record is not well developed with

23

respect to the illegal cooperatives in the City, but UMMP asserts that there were "at least 30" cooperatives illegally operating in the City. Other than this assertion, the record contains no data about the actual number of illegal cooperatives, their location in the City, or the ability of patients to effectively locate and access them despite their illegal status. Other statements in the administrative record indicate that, prior to the enactment of the Ordinance, City authorities took action to abate the operation of illegal cooperatives. Specifically, a memorandum in the administrative record from a City staff member explains that prior to the enactment of the Ordinance, the City treated the unpermitted use of premises to operate a medical marijuana dispensary as a violation of local zoning laws to be abated as a public nuisance. This approach is consistent with case law establishing that a local jurisdiction may abate the unauthorized operation of medical marijuana cooperates as a nuisance. (*City of Riverside*, *supra*, 56 Cal.4th at p. 762.) The administrative record shows that the City's abatement efforts included the "shuttering over 100 illegal dispensaries in 2011-2012" by the City Attorney's office. Cases of illegally operating medical marijuana cooperatives in the City were also referred to the Neighborhood Code Compliance Department which serves under the Mayor.

As the City correctly points out, the enactment of the Ordinance does nothing to *increase* abatement proceedings against illegal cooperatives. The City was able to take action against illegal cooperatives *before* the enactment of the Ordinance, and the Ordinance confers no additional power on the City to do so. Thus, UMMP's assumption that the Ordinance will significantly reduce the number of illegal cooperatives is speculative and unfounded.

24

Instead of reducing the ability to obtain medical marijuana in the City, the Ordinance is intended to *increase* access to medical marijuana in the City by affirmatively allowing the *legal* establishment of the cooperatives in the City where none existed before. As we have explained, the Ordinance will increase access by creating the opportunity for the establishment of up to 30 legally operating cooperatives in the City. Further, because undisputed evidence in the record shows that cooperatives may choose to locate in eight of the nine council districts in the City, with six of those districts having the potential for a maximum of four cooperatives, and two districts having the potential for a maximum of three cooperatives, patients will have several different locations throughout the City to obtain their medical marijuana without having to travel especially long distances. UMMP accordingly has not established that the enactment of the Ordinance may cause a reasonably foreseeable indirect physical change in the environment due to medical marijuana patients driving farther than they currently drive to obtain their medical marijuana.

2. *Increased Cultivation of Marijuana*

UMMP's next contention is that the enactment of the Ordinance may cause a reasonably foreseeable change to the environment because patients in the City will decide to undertake their own indoor cultivation of marijuana rather than travel to inconveniently located cooperatives. According to UMMP, indoor cultivation of marijuana has harmful environmental impacts, including increased electricity use.

This argument fails because it is based on the same unwarranted assumption that we discussed above, namely that the enactment of the Ordinance will make it more

25

difficult for patients to access medical marijuana in the City because it will cause current illegal cooperatives to close and will locate legal cooperatives in inconvenient locations. As we have explained above, there is no basis for UMMP's assumption that the enactment of the Ordinance will make it more difficult to access medical marijuana in the City than prior to the enactment of the Ordinance.

Moreover, in the context of their cultivation argument, UMMP asks us to make a further unwarranted and speculative assumption. UMMP assumes that when faced with inconveniently located cooperatives, a significant number of patients will decide to set up their own cultivation operation. That assumption rests on pure speculation. In *City of Upland*, we rejected a similar argument concerning anticipated indoor marijuana cultivation as based on layers of unfounded assumption and speculation. (*City of Upland*, *supra*, 245 Cal.App.4th at p. 1275 ["UMMP *assumes* that 2 percent of the City's population (1,504 residents) are medical marijuana patients; that those patients use one ounce of marijuana per month; that, '[o]bviously,' those patients '*may* establish up to 1,504 home cultivation sites in the City' as a result of the 2013 ordinance [prohibiting medical marijuana delivery]; and that the cultivation '*may*' take place indoors because those patients do not live in locations suitable for outdoor cultivation."].)

As a secondary argument, UMMP contends that because the Ordinance defines a "medical marijuana consumer cooperative" as "a facility where marijuana is transferred to qualified patients or primary caregivers in accordance with the Compassionate Use Act of 1996 and the [MMP]," the Ordinance applies to small groups of individual patients who cultivate marijuana and share marijuana on an informal basis and will prohibit their

26

activities. According to UMMP, unless they obtain a conditional use permit under the Ordinance, patients who formerly shared home-cultivated marijuana will be forced to either set up individual cultivation operations or drive long distances to cooperatives, adversely impacting the environment. We reject this argument. As the City explains, the Ordinance clearly states that it is "intended to apply to commercial retail facilities." Thus, the Ordinance will not require small groups of individual patients who informally grow and share marijuana to obtain a conditional use permit if they are not engaging in commercial retail operations.

In sum, we find no merit to UMMP's contention that enactment of the Ordinance may cause a reasonably foreseeable change to the environment by increasing the indoor cultivation of marijuana.

3.      *Increased Development in Certain Parts of the City*

UMMP's final argument is that the cooperatives established under the Ordinance will have to be located somewhere, and "this may result in new construction activity." According to UMMP, the possible construction activity will have an impact on the environment.[13]

---

[13]    Citing *Muzzy Ranch*, *supra*, 41 Cal.4th at page 383, UMMP uses the term "displaced development" to describe the environmental impact that may be caused by the enactment of the Ordinance. However, the concept of displaced development does not apply here. Displaced development as discussed in *Muzzy Ranch* occurs when the enactment or amendment of a land use plan restricting residential development in one area will have the reasonably foreseeable effect of causing residential development to shift to a different area where it previously was not anticipated at that level. (*Id*. at pp. 382-383.) Here, the Ordinance is not the type of general land use restriction that will

27

We reject the argument because it is purely speculative to assume that the establishment of the cooperatives permitted under the Ordinance will require any new buildings to be constructed, as cooperatives could simply chose to locate in available commercial space in an existing building. (Cf. *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 476 [concluding that a school district's formation of a community facilities district for possible new facilities did not constitute a CEQA project because it was "nothing more than speculation" that the district would decide to undertake new construction as a result].)

Moreover, to the extent that a conditional use permit application is filed for a cooperative that will entail new construction, the appropriate review under CEQA for that specific construction project will be required to be performed by the City at that time. As it is impossible to know whether the enactment of the Ordinance will result in any new construction, it is premature to require that the City perform a CEQA analysis at this point based on the mere possibility of new construction. (*Friends of Sierra Railroad*, *supra*, 147 Cal.App.4th at p. 657 ["CEQA review has to happen far enough down the road toward an environmental impact to allow meaningful consideration in the review process of alternatives that could mitigate the impact."].)[14]

shift necessary development to a different area than previously expected. Thus, displaced development is not at issue.

14      UMMP contends that the enactment of the Ordinance should be found to be a project so that mitigation measures can be taken at an early enough stage to prevent harmful environmental impacts. This argument fails because it makes a basic assumption that UMMP has not established, namely that the enactment of the ordinance may cause a

Having considered and rejected each of the three categories of possible environmental impact from the enactment of the Ordinance identified by UMMP, we conclude that the enactment of the Ordinance does not constitute a project as defined in CEQA because it does not have a potential for resulting in a reasonably foreseeable indirect physical change in the environment.

DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

NARES, J.

---

reasonably foreseeable indirect change to the environment. If there is no basis to conclude that the enactment of the Ordinance may cause a change to the environment, there is also no basis to consider how such changes may be mitigated.

29